IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| ELISA AVERY, | ) | CASE NO. 1:18-cv-00845 |
| | ) | |
| Plaintiff, | ) | JUDGE JOHN R. ADAMS |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | KATHLEEN B. BURKE |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY ADMINISTRATION, | ) | |
| | ) | **REPORT AND RECOMMENDATION** |
| Defendant. | ) | |

Plaintiff Elisa Avery ("Plaintiff" or "Avery") seeks judicial review of the final decision of Defendant Commissioner of Social Security ("Commissioner") denying her application for Disability Insurance Benefits ("DIB").  This Court has jurisdiction pursuant to 42 U.S.C. § 405(g).  This matter has been referred to the undersigned Magistrate Judge for a Report and Recommendation pursuant to Local Rule 72.2.

For the reasons explained herein, the undersigned recommends that the Court **AFFIRM** the Commissioner's decision.

## I.  Procedural History

Avery protectively filed[1] an application for DIB on April 17, 2014, alleging a disability onset date of April 7, 2014.  Tr. 10, 90, 91, 162-165, 181.  She alleged disability due to postural

---

[1] The Social Security Administration explains that "protective filing date" is "The date you first contact us about filing for benefits. It may be used to establish an earlier application date than when we receive your signed application."  http://www.socialsecurity.gov/agency/glossary/ (last visited 4/2/2019).

orthostatic tachycardia syndrome ("POTS"),[2] orthostatic intolerance, vestibular migraines, asthma, and sinus tachycardia.  Tr. 91, 103, 120, 125, 185.  After initial denial by the state agency (Tr. 120-123) and denial upon reconsideration (Tr. 125-127), Avery requested a hearing (Tr. 129-130).  A hearing was held before an Administrative Law Judge ("ALJ") on April 12, 2016.  Tr. 39-89.

In his March 1, 2017, decision (Tr. 7-30), the ALJ determined that Avery had not been under a disability from April 7, 2014, through the date of the decision (Tr. 10, 24).  Avery requested review of the ALJ's decision by the Appeals Council.  Tr. 159-161.  On February 14, 2018, the Appeals Council denied Avery's request for review, making the ALJ's decision the final decision of the Commissioner.  Tr. 1-6.

## II. Evidence

### A.      Personal, educational, and vocational evidence

Avery was born in 1988.  Tr. 45.  She lived with her husband and two minor sons.  Tr. 46.  Avery has a high school education plus one year of online college courses.  Tr. 47, 186.  At the time of the hearing, Avery was taking one online course.  Tr. 77.  The school she was taking the classes through was set up for students to take one course at a time.  Tr. 77.  She had one year to complete and pass the course and, once that was achieved, she could move on to the next course.  Tr. 77.  Because of her health problems, some of Avery's education involved home schooling.  Tr. 48.  Avery's work history involved work at daycare centers as a childcare provider/teacher assistant and a site supervisor, which involved managing other childcare

---

[2] Postural orthostatic tachycardia syndrome is "a group of symptoms (not including hypotension) that sometimes occur when a person assumes an upright position, including tachycardia, tremulousness, lightheadedness, sweating, and hyperventilation; this is seen more often in women than in men, and the etiology is uncertain."  *See* Dorland's Illustrated Medical Dictionary, 32nd Edition, 2012, at 1844.

providers.  Tr. 48-50, 51-53.    Avery also worked at a tax service company doing tax preparation.  Tr. 50-51.

## B.    Medical evidence

### 1.    Treatment history

On November 8, 2013, Avery saw Dr. Yuebing Li, M.D., Ph.D., a physician in the Neuromuscular Center of the Cleveland Clinic for her chief complaint of dizziness.  Tr. 289-291. Dr. Li noted that Avery had been seen and evaluated by Dr. Frederick Jaeger.  Tr. 289.  Avery relayed that her first symptoms started when she was a teenager in high school.  Tr. 289.  One day in September 2003, Avery passed out and fell backwards while she was dancing.  Tr. 289. She felt her heart beating fast at that time.  Tr. 289.  Avery had been sick with a cold that week. Tr. 289.  She was treated at the emergency room with IV fluid.  Tr. 289.  Testing and bloodwork was negative.  Tr. 289.  Avery reported that, since that time, she had numerous instances of dizzy spells and loss of consciousness as well.  Tr. 289.  Initially, her treatment consisted of returning to the hospital to receive IV fluids.  Tr. 289.  Avery had to be home schooled.  Tr. 289.  Avery was working full time when she saw Dr. Li.  Tr. 289.  In 2004, Avery was finally diagnosed with POTS.  Tr. 289.  She had several tilt-table tests that were positive.  Tr. 289.  She was treated with various medications between 2007 and 2011 but had stopped taking them.  Tr. 289.  Without medication, Avery's symptoms continued and remained about the same.  Tr. 289.  At the time of her visit, Avery indicated she had four to seven episodes of dizziness per day, each episode lasting a few minutes.  Tr. 289.   Her dizzy episodes were triggered by multiple factors, e.g., heat, putting arms overhead, standing up too fast, etc.  Tr. 289.  Avery reported having episodes of near syncope four to five times each week.  Tr. 290.  She had last passed out in August 2013 and recalled three or four episodes of loss of consciousness that year.  Tr. 290.  Avery relayed

that she drank three liters of water per day and consumed six to eight grams of salt each day.  Tr. 290.  She wore compression stockings to the knee level and started cardiac rehabilitation in July 2013.  Tr. 290.  She had recently started taking some midodrine[3] but it was not helping her much.  Tr. 290.  Avery reported feeling tired most of the time; having loss of feeling in her arms and legs; having pain in her right leg a few times each week for a few hours at a time; having chronic pain; and having migraine headaches about twice per week that lasted on average for a day and sometimes several days.  Tr. 290.

Dr. Li concluded that it was clear that Avery had a longstanding history of POTS, which had started following an infection.  Tr. 291.  Dr. Li indicated that Avery had undergone a lot of behavioral modifications for POTS.  Tr. 291.  Dr. Li also indicated that Avery's dizziness might not be totally explained by POTS, noting that Avery had significant migraine attacks and that dizziness/vertigo was a common symptom in individuals with such frequent headaches.  Tr. 291.  Di. Li noted that a significant portion of Avery's dizziness was not postural and did not appear to reflect orthostatic intolerance; Avery described a feeling of vertigo with positional changes of her head even when lying in bed.  Tr. 291.  Dr. Li felt that further evaluation of Avery's symptoms was warranted and referred her to Dr. Cherian who specialized in treating dizziness/vertigo.  Tr. 291.  Dr. Li also started Avery on Elavil for migraine prevention.  Tr. 291.

In January and February 2014, Avery returned to see Dr. Frederick J. Jaeger, Jr., D.O., at the Department of Cardiovascular Medication, Section of Electrophysiology, Center for Syncope and Autonomic Disorders, for reevaluation of recurrent syncope and near syncope, lightheadedness, migraines, and shortness of breath.  Tr. 285-286.  During her February 24,

---

[3] Midodrine is used to treat symptoms of low blood pressure when standing.  https://www.webmd.com/drugs/2/drug-14042/midodrine-oral/details (last visited 4/2/2019).

2014, visit with Dr. Jaeger, it was noted that Avery tried exercising, augmenting her diet with fluid and salt, and using compression stockings but she remained symptomatic. Tr. 285. Avery had a recent episode, which required hospitalization. Tr. 285. She had been having chest pain, shortness of breath, tightness, diaphoresis, lightheadedness and apparent loss of consciousness. Tr. 285. The episode occurred while Avery was at work and it was reported that she had had prolonged unresponsiveness despite a normal heart rate and blood pressure. Tr. 285. During her February 24, 2014, visit, Avery's vital signs were normal and she was not tachycardic while in an upright posture. Tr. 285. Dr. Jaeger recommended a loop recorder and consultations with general neurology and epilepsy. Tr. 285.

Avery saw Dr. Jaeger for follow up on March 31, 2014. Tr. 263-267. Avery's loop recorder had recently been removed due to an infection. Tr. 264, 269. Avery felt that she was unable to work full-time due to weakness, fatigue, palpitations, lightheadedness, etc. Tr. 264. Dr. Jaeger felt that, if Avery's full-time schedule was exacerbating her symptoms, it seemed reasonable for her to cut back on that schedule if her employer would allow it. Tr. 264. Following the visit, on April 1, 2014, Dr. Jaeger authored a letter in support of her desire to work part time (20 hours per week) until May 30, 2014, stating:

> Mrs. Avery's symptoms are exacerbated by working full time and feels it would be beneficial to her well being to reduce her weekly working hours. I agree with Mrs. Avery's decision and hope that you can accommodate her change in schedule.

Tr. 671.

On April 22, 2014, Avery attended a physical therapy vestibular evaluation at the Cleveland Clinic for her dizziness, headaches, neck pain and POTS. Tr. 268-271. The evaluation was conducted by Sunni Klein, PT ("physical therapist Klein" or "Klein"). Tr. 271. The following problems were observed during the evaluation: decreased range of motion;

5

decreased dynamic gait; decreased postural control; decreased knowledge of symptom self-management; dizziness; imbalance; and pain.  Tr. 271.  Avery complained of being unable to lie flat due to spinning sensation.  Tr. 271.  Klein noted that Avery's headaches improved with posture correction and cervical retraction during the visit.  Tr. 271.  Klein felt that Avery could benefit from positional testing to rule out a vestibular component to her symptoms and that Avery could benefit from physical therapy to address her impairments and reduce her symptoms. Tr. 271.

On April 23, 2014, Avery saw Dr. Jorge Calles, M.D., in the endocrinology department for consultation for syncope and orthostasis.  Tr. 327-337.  Dr. Calles concluded that the hormonal evaluation did not identify a reason for Avery's syncope.  Tr. 332.  Dr. Calles increased Avery's dose of Florinef.  Tr. 332.  He recommended that Avery monitor her blood sugar four times every day and at any time an episode occurred.  Tr. 332.  Dr. Calles also recommended a fasting test to rule out organic hypoglycemia and that Avery measure her blood pressure at home three to four time every week.  Tr. 332.  Dr. Calles noted that neurology would be consulted to rule out epilepsy, but Dr. Calles doubted that was the issue.  Tr. 332.

On May 18, 2014, Avery sought treatment at the emergency room for chest pain, shortness of breath, and a racing heart.  Tr. 308-317.  Avery reported that she had been having near syncopal events two times each week for the past year.  Tr. 310.  She indicated that her chest pain was crushing and it was worse with breathing.  Tr. 310.  Avery relayed that she noticed that her heart rate monitor had gone to 191 that day.  Tr. 310.  Avery indicated she was experiencing a migraine during her emergency room visit.  Tr. 310.  She thought she lost consciousness the night before.  Tr. 310.  The emergency room assessment was slight dehydration and POTS.  Tr. 310.

On May 19, 2014, Avery had a physical therapy appointment.  Tr. 914-915.  Avery had to cancel her therapy appointment the prior week due to elevated symptoms.  Tr. 915.  She reported that she had been at the emergency room because her heart rate kept shooting up.  Tr. 914.  Avery indicated she had been given IV fluids at the hospital.  Tr. 914.  During her physical therapy appointment, Avery was feeling better and did not have a headache.  Tr. 914.  Because of elevated symptoms, Avery indicated she had not been as compliant with her exercises.  Tr. 914.  Avery indicated that retraction was providing her with some relief from her headaches and neck stiffness and being mindful of her posture was helping with her headaches.  Tr. 915.  Avery was concerned about her symptoms increasing when the weather warmed up.  Tr. 915.  Klein observed that Avery had a reduced tolerance for exercise during the therapy session because she was becoming hot and symptomatic of dizziness.  Tr. 916.  Avery's symptoms improved with a cold pack and cold water.  Tr. 916.  Klein encouraged Avery to increase the frequency of her cervical exercises because they seemed to help her headaches, which could be a trigger for her POTS' symptoms.  Tr. 916.  Klein also recommended that Avery look into a cooling vest to help her tolerate exercise and heat in the summer.  Tr. 916.

Avery also had a visit with Dr. Jaeger on May 19, 2014, to follow up regarding the previous day's emergency room visit.  Tr. 501-503.  Avery reported feeling less dizzy and there had been no repeat syncope since the evening before her emergency room visit.  Tr. 501.  Avery denied any more palpitations, chest pains, shortness of breath, orthopnea,[4] PND,[5] or edema.  Tr. 501.  Dr. Jaeger noted that Avery was still taking a low dose of Florinef as well as Cymbalta.  Tr.

---

[4] Orthopnea "is the sensation of breathlessness in the recumbent position, relieved by sitting or standing." https://www.ncbi.nlm.nih.gov/books/NBK213/ (last visited 4/2/2019).

[5] "PND" likely stands for paroxysmal nocturnal dyspnea, which is "a sensation of shortness of breath that awakens the patient, often after 1 or 2 hours of sleep, and is usually relieved in the upright position." https://www.ncbi.nlm.nih.gov/books/NBK213/ (last visited 4/2/2019).

503.  Dr. Jaeger also indicated that Avery's vital signs showed obvious orthostatic tachycardia. Tr. 503.

Upon Dr. Jaeger's recommendation Avery followed up with Dr. Li on May 21, 2014, for consideration of other types of medication.  Tr. 510-514.  Examination findings were generally normal.  Tr. 512-513.  Dr. Li discontinued midodrine because it was not helping, noting she was on a low dose and it might worsen her headaches and increase her heart rate.  Tr. 513.  Dr. Li recommended that Avery continue taking Florinef but noted that it might not be effective for her. Tr. 513.  Dr. Li also recommended that Avery restart Elavil[6]  because it had helped her headaches in the past.  Tr. 513.  If that did not work or if Avery could not tolerate it, Dr. Li indicated that Avery could try an SNRI (e.g., Cymbalta, Effexor, or Prestiq) as suggested by Dr. Jaeger and, if those were not effective, they could consider Mestinon.  Tr.  513.  Dr. Li referred Avery to Dr. Kara Browning, a physician in his department who specialized in managing POTS patients.  Tr. 513.

Avery saw Dr. Browning on June 25, 2014.  Tr. 521-524.  Avery reported being frustrated with the impact of symptoms on her daily activities and quality of life.  Tr. 521. Notwithstanding her symptoms she was continuing to work full time with the Head Start Program.  Tr. 521.  Avery relayed that her symptoms had worsened since January of that year to the point of occurring every day.  Tr. 521.   Dr. Browning recommended that Avery continue with non-pharmacologic measures, including more consistent use of compression stockings, increasing water and salt intake, elevating her head in bed, graded exercise program, muscle contraction measures to decrease venous pooling, good sleep hygiene, and addressing anxiety

---

[6] Amitriptyline is the generic name for Elavil.  https://www.webmd.com/drugs/2/drug-8611/amitriptyline-oral/details (last visited 4/2/2019).

8

and depression if present.  Tr. 523.  As far as medications, Dr. Browning recommended that Avery stop taking midodrine because it could be making her migraines worse.  Tr. 523.  She recommended that Avery decrease her dose of Florinef; add Cymbalta; and wean off of amitriptyline depending on the results of Cymbalta.  Tr. 523.  Dr. Browning also recommended that Avery follow up with some of the other specialists that she had seen.  Tr. 523.

Pulmonary function testing performed on August 25, 2014, at MetroHealth was "consistent with essentially normal findings."  Tr. 600.  Other testing performed that same day (methacholine challenge test) was indicative of heightened bronchial reactivity consistent with a diagnosis of asthma.  Tr. 600.

Avery saw Dr. Browning for follow up on August 27, 2014.  Tr. 678-680.  Avery indicated that her symptoms were worse the prior week.  Tr. 678.  She had returned to work full time but she was not sure she would be able to work a full-time schedule.  Tr. 678.  Avery relayed that her legs were feeling better since taking Cymbalta.  Tr. 678.  She was having to take more ibuprofen daily for her headaches and leg and back pain.  Tr. 678.  Avery also indicated she was having occasional episodes of vertigo.  Tr. 678.  Avery had not had a syncope episode since her last visit.  Tr. 679.  Dr. Browning made some adjustments to Avery's medications.  Tr. 680.  Dr. Browning noted that Avery could benefit from counseling.  Tr. 680.  Dr. Browning provided Avery with a letter for her employer regarding continuing with part-time hours.  Tr. 673, 680.  Avery was advised to follow up with Dr. Browning in two to three months or as needed.  Tr. 680.

On September 11, 2014, Avery met with nurse Karen A. Majewski, CNP, in the pulmonary department for a follow-up asthma visit.  Tr. 652-656.  Nurse Majewski had previously seen Avery for her asthma in 2012.  Tr. 653.  Avery was prescribed Qvar.  Tr. 653.

She had been doing fairly well with respect to her asthma since that time.  Tr. 653.  Avery had stopped her Qvar about six weeks prior because her breathing was good and she was tired of taking medications.  Tr. 653.  Since stopping the Qvar, Avery noticed some changes in her breathing with symptoms of chest tightness, shortness of breath, coughing and wheezing about three times per week.  Tr. 653.  She was using saba[7] once per week.  Tr. 653.  Avery noted that usual triggers for her asthma included hot and cold air, weather changes, strong odors, pollens, and stress.  Tr. 653.  Nurse Majewski recommended that Avery restart Qvar and saba as needed.  Tr. 654.  Nurse Majewski provided Avery with instructions for monitoring her symptoms and peak flow and she advised Avery that, if she was stable over the following two weeks, she could start a trial of a low dose cardioselective beta blocker.  Tr. 655.

On September 18, 2014, Avery was transported by ambulance from work to the emergency room.  Tr. 649-652.  She complained of a racing heart.  Tr. 649.

Avery followed up with Dr. Calles on September 24, 2014.  Tr. 643-648.  Avery was having a bad day with dizziness.  Tr. 644.  She relayed that her syncope was continuing.  Tr. 644.  Avery reported that she had been in the hospital the prior week.  Tr. 644.  Avery's neurologist had adjusted her Florinef and her neurologist and cardiologist were interested in starting her on Metoprolol.[8]  Tr. 644.  Dr. Calles noted an increase in Avery's blood pressure and heart rate with standing.  Tr. 648.  Dr. Calles increased Avery's dosage of Florinef and planned to consult with

---

[7] "SABAs are a type of bronchodilator used for the acute relief of asthma symptoms. SABA stands for short-acting beta agonist, the most common one being albuterol . . . "  https://www.verywellhealth.com/albuterol-sabas-and-asthma-201168 (last visited 4/2/2019).

[8] Metoprolol Succinate is a "beta-blocker used to treat chest pain (angina), heart failure, and high blood pressure." https://www.webmd.com/drugs/2/drug-8814/metoprolol-succinate-oral/details (last visited 4/2/2019).

Avery's other treating providers regarding proceeding with beta-blockers or another treatment plan.  Tr. 648.

Avery saw Dr. Browning on September 29, 2014, for a test dose of Metoprolol.  Tr. 687. Avery denied shortness of breath, chest tightness, or discomfort relating to taking the medication and, on examination, Dr. Browning noted that Avery's lungs were clear to auscultation and there was no appreciable wheezing.  Tr. 687.  Avery relayed that she was having some difficulty at work with stair climbing which was causing dyspnea, tachycardia, and dizziness.  Tr. 687.  Dr. Browning recommended that they wait and see if the addition of beta-blockers could help alleviate her symptoms before adding additional work restrictions.  Tr. 687.  Because of complaints of an increase in Avery's migraines, Dr. Browning adjusted Avery's amitriptyline. Tr.  687.  Avery's Cymbalta prescription remained unchanged.  Tr. 687.  Dr. Browning recommended that they hold off on Dr. Calles' recommendation that Avery start on a trial of pseudoephedrine until they were able to stabilize her on Metoprolol.  Tr. 687.

Avery saw Nurse Majewski on October 9, 2014, for follow up regarding his asthma.  Tr. 639.  Avery had been taking her Qvar and had noted improvement until she became ill with an upper respiratory infection.  Tr. 639.  She was able to control her symptoms during that time with use of saba.  Tr. 639.  Nurse Majewski noted that a chest x-ray from February 2014 showed clear lungs.  Tr. 640.  Physical examination findings were normal. Tr. 640.  Nurse Majewski assessed mild to moderate persistent asthma that was not well controlled with improving exacerbation. Tr. 640.  Nurse Majewski continued Avery's medications.  Tr. 641.

On November 1, 2014, Dr. Browning provided a "medical excuse," setting forth work restrictions of part-time work, 20 hours/week, from November 1, 2014, until December 31, 2014. Tr. 672.  Avery saw Dr. Browning a few days later on November 5, 2014.  Tr. 695.  Avery

reported having to take several sick days because of her symptoms but she was still interested in working.  Tr. 695.  Her current work schedule was four days per week from 8:00 a.m. – 1 p.m. Tr. 695.  Avery noticed some increased fatigue since starting on beta blockers but she had also noticed less tachycardia.  Tr. 695.  Avery was interested in returning to cardiac rehab since her tachycardia had improved.  Tr. 695.  Physical examination findings of Avery's heart and lungs were normal.  Tr. 696.  Avery walked with a cane and had an antalgic gait.  Tr. 696.  Dr. Browning indicated that Avery could proceed with Dr. Calles' suggestion of trying pseudoephedrine because of the alpha receptor effects but Dr. Browning recommended that Avery use a short acting Sudafed because pseudoephedrine could exacerbate tachycardia.  Tr. 696.

On December 4, 2014, Avery saw Julia A. Anisimova, a nurse practitioner with the neurology department at the Cleveland Clinic, for complaints of numbness throughout her legs. Tr. 740.  Avery described a sensation of "needles going though out the entire leg."  Tr. 740. She had experienced some sensory changes in the past but her current pain was different and had really been bothering her for the prior week and a half.  Tr. 740.  She indicated that the pain was worse with sitting and bending/flexing of her legs.  Tr. 740.  Cymbalta and amitriptyline had helped initially but her legs were feeling weaker and she had a decreased tolerance for walking and standing.  Tr. 740.  Avery was continuing to work four days per week from 8:00 a.m. – 1 p.m.  Tr. 740.  On physical examination Nurse Anisimova observed normal strength, tone and bulk in all muscle groups; general intact sensations (except for some decreased sensation on the inner aspect of her calves); and intact gait.  Tr. 740.  Nurse Anisimova advised Avery to stop taking the Sudafed because it was not helping and she had noticed her POTS had worsened since

starting.  Tr. 740.  Nurse Anisimova increased Avery's Cymbalta and indicated she would discuss with Dr. Browning testing for small fiber neuropathy by means of a skin biopsy.  Tr. 740.

Avery saw Dr. Browning on January 5, 2015, with complaints of increased lower extremity paresthesias and pain.  Tr. 945-947.  Avery relayed that she was no longer working, explaining that she had been let go from her employment because of regular absences for medical symptoms.  Tr. 945.  Avery relayed that she wondered if the beta block was contributing to her fatigue.  Tr. 945.  Avery had recently had a follow up with cardiac rehabilitation.  Tr. 946. She was wearing compression stockings, taking in fluids and salt, and performing lower extremity exercises.  Tr. 946.  On physical examination, Avery exhibited minimal to moderate range of motion restrictions in the lumbar spine; motor examination of the lower extremities was normal; her muscle bulk and tone were normal; and she had a positive straight leg raise on the right when sitting or lying.  Tr. 946.   Dr. Browning made some adjustments to Avery's medications and advised Avery to follow up in six to twelve weeks.  Tr. 946.

At Dr. Browning's request, on January 26, 2015, Dr. Daniel J. Mazanec, M.D., saw Avery for a consultation regarding back and leg pain.  Tr. 950-956.[9]  Avery ambulated with a cane because of her POTS and her leg symptoms.  Tr. 950.  She described new, progressive bilateral lower extremity paresthesias and weakness with pain.  Tr. 955.  Avery indicated that her leg symptoms were increasing.  Tr. 950.  Also, she indicated that she had been experiencing bilateral upper extremity numbness that was non-radicular in distribution and intermittent.  Tr. 950.  Dr. Mazanec noted there were limited findings on examination.  Tr. 953-955.  Dr. Mazanec assessed sciatica and recommended an MRI of the lumbar spine.  Tr. 955.

---

[9] Records from this visit are also located at Tr. 762-772.

Avery attended a cardiac rehabilitation session on January 28, 2015.  Tr. 957.  Avery complained of lightheadedness 17 minutes into her 30-minute session.  Tr. 957.  Avery's workload was reduced which caused her lightheadedness to decrease and allowed her to continue.  Tr. 957.  Continued cardiac rehabilitation was recommended.  Tr. 957.

The lumbar MRI was performed on February 5, 2015.  Tr. 773-775.  The impression was multi-level discogenic and facet hypertrophic degenerative change; moderate to severe foraminal stenosis on the right at L5-S1; and minimal anterior wedging of the L1 vertebral body without evidence of marrow edema.  Tr. 775.

Avery saw Dr. Browning on February 17, 2015.  Tr.  958-959.  Avery indicated her tachycardia had improved with a higher dose of beta blockers.  Tr. 958.  Avery relayed that she would rather have fatigue secondary to beta blocker usage than tachycardia.  Tr.  958.  Her asthma was stable on the higher dose of beta blockers.  Tr. 958.  Avery noted that she had started to take Cymbalta at night which helped decrease her daytime sedation.  Tr. 958.  Avery was still having problems performing household chores because of her fatigue and tachycardia.  Tr. 958.  Avery discussed the leg and back pain she was experiencing.  Tr. 958.  Dr. Browning noted that Avery had seen Dr. Mazanec at the Spine Center and had undergone an MRI which showed spondylosis greatest at the L5-S1 without evidence of central or foraminal nerve root compression.  Tr. 958.  Avery reported no syncope episodes since her last visit.  Tr. 958.  Dr. Browning concluded that Avery's POTS was stable but she needed cardiac reconditioning to improve her functional capacity.  Tr. 959.  Dr. Browning recommended physical therapy for Avery's lumbar spine issues.  Tr. 959.  She also recommended that Avery continue to try to increase her activity, try to wean down her Elavil to see if her daytime sedation improved;

continue non-pharmacologic measures, and resume cardiac rehabilitation program when able to tolerate from a spine perspective.  Tr. 959.

On March 6, 2015, Avery attended a cardiac rehabilitation session.  Tr. 963-964.  During the session, Avery complained of severe lightheadedness, moderate shortness of breath, and chest tightness 12 minutes into a higher workload.  Tr. 963.  Exercise was terminated and Avery was assisted to a chair to elevate her legs.  Tr. 963. Avery's symptoms resolved after 10-15 minutes.  Tr. 963.  Avery indicated that she had undergone a colonoscopy the prior day and had not been able to eat, which the therapist noted could be related to her symptoms during the session that day.  Tr. 963.  The therapist recommended that Avery continue with exercise at a lower workload at the next session and gradually increase the workload to the level of the March 6, 2015, session.  Tr. 963.

On March 10, 2015, Avery started physical therapy for her low back pain and lower extremity pain.  Tr. 964-968.  Physical therapist Klein observed that Avery had reduced posture, lumbar mobility and decreased awareness of self-management of her pain symptoms.  Tr. 967. Avery responded well to extension-based exercises during the session but was limited due to some complaints of dizziness on exertion due to her POTS.  Tr. 967.  The therapist anticipated that Avery would do well with physical therapy to address her impairments and reduce her symptoms.  Tr. 967.  Avery's prognosis was good.  Tr. 967.

Avery attended cardiac rehab the next day – March 11, 2015.  Tr. 968-970.  Exercise was stopped 14 minutes into the session because Avery became lightheaded with chest tightness and was seeing black spots.  Tr. 970.  Avery noted that her symptoms had been occurring more frequently and earlier in the day since she had reduced her dose of Metoprolol.  Tr. 970.  She had

no energy but was no longer drowsy.  Tr. 970.  Avery was advised to follow up with Dr. Browning.  Tr. 970.

Avery attended a second physical therapy session on March 25, 2015.  Tr. 971-972.  She relayed that she had passed out the prior week so she had cancelled an earlier physical therapy appointment.  Tr. 971.  Physical therapist Klein noted that Avery had some improvement in her symptoms with performance of lumbar extension at home and she had improved her postural awareness, increased her independence with home exercises, and had decreased the intensity of her pain.  Tr. 972.   The same day, Avery attended a cardiac rehab appointment.  Tr. 973-974.  Avery stopped exercise on a semirecumbent cycle after 9 minutes because of chest tightness, lightheadedness, and flushing.  Tr. 974.  Avery needed assistance transferring to a chair to elevate her legs.  Tr. 974.  Avery expressed frustration regarding her symptoms, noting that she was following all of the prescribed advice.  Tr. 974.  Avery's symptoms resolved after about 10 minutes but she sat and rested for about 30 minutes before feeling well enough to leave.  Tr. 974.  Avery continued to report worsening of her symptoms even though she resumed a higher dose of Metoprolol.  Tr. 974.  Avery was advised to follow up with her physicians.  Tr. 974.

During an April 8, 2015, cardiac rehab appointment, Avery reported severe dizziness over the prior week.  Tr. 976.  Her dizziness was worse with lifting.  Tr. 976.  She felt that it was related to a change in her Metoprolol.  Tr. 976.  During the April 8, 2015, session, Avery was feeling very drowsy; she was having a hard time coming up with words; and she was having chest pain, which she described as someone "squishing" her.  Tr. 976.  Avery indicated that her migraines had improved.  Tr. 976.  Avery exercised with the fan on, which helped, and she was wearing compression stocking and drinking fluids during the session.  Tr. 976.

During an April 9, 2015, physical therapy session, physical therapist Klein noted improvement in Avery's pain symptoms and range of motion since starting therapy and improved postural awareness and exercises.  Tr. 978.  Physical therapist Klein noted that Avery was limited by her POTS' symptoms with increased exertion.  Tr. 978.  On April 10 and April 17, 2015, Avery completed a cardiac rehab session with no significant complaints.  Tr. 979-980.

Avery saw Dr. Jaeger on April 20, 2015.  Tr. 980-984.  Avery reported that, since changing her Metoprolol to long-acting, her heart was racing more frequently and she was very fatigued.  Tr. 982.  She indicated she had missed cardiac rehab sessions because she was too exhausted.  Tr. 982.  She reported near syncope every day and that her heart raced three to five times per week with minimal exertion.  Tr. 982.  Avery had been called for jury duty and was concerned she would be unable to participate because of her need for frequent bathroom breaks due to her increased fluid intake.  Tr. 982.  Physical examination findings were normal.  Tr. 983.  Dr. Jaeger indicated Avery should try to continue with cardiac rehab and discuss with her other physicians possible alternatives to Elavil because it could contribute to reflex tachycardia.  Tr. 983.

Avery saw Dr. Calles on May 27, 2015, for follow up regarding her syncope and orthostasis.  Tr. 1780-1786.  Avery relayed that her syncope was continuing but was less intense.  Tr. 1780.  She was feeling a little better and smiling.  Tr. 1780.  However, she had been at the hospital the prior week due to two episodes in less than an hour.  Tr. 1780.  Avery's neurologist had adjusted her Florinef.  Tr. 1781.  Dr. Calles indicated that his hormonal evaluation did not identify a reason for Avery's syncope.  Tr. 1786.

The next day, Avery saw Drs. Tariq and Tepper in the neurology department for consultation regarding her headaches.  Tr. 1923-1928.  The assessment was that Avery had

17

migraines with aura.  Tr. 1929.  Avery's migraines were chronic.  Tr. 1929.  They occurred 15 days per month, with there being aura plus migraines twice weekly.  Tr. 1929.  The usual duration of Avery's aura was 3-5 minutes, up to 60 minutes.  Tr. 1929.  Avery indicated that her POTS' symptoms had improved and she was willing to try vestibular and head and neck therapy again.  Tr. 1928.  Recommendations included use of a Zomig nasal spray at the time of a severe migraine attacks; avoidance of over-the-counter pain medications more than two days per week; referral for trans magnetic stimulation study; and referral for vestibular physical therapy and TMJ dysfunction.  Tr. 1928.

On May 29, 2015, Avery attended a cardiac rehab session.  Tr. 1939.  She was able to increase her workload during her session.  Tr. 1939.  Avery continued cardiac rehab sessions and physical therapy sessions throughout 2015.[10]  Tr. 1942-1962, 1984-1988, 1995-1999.  At a December 3, 2015, physical therapy appointment, physical therapist Klein noted that Avery had significant reduction in her headaches and jaw pain since getting a bite guard from her dentist.  Tr. 1996.  But Avery was getting evaluated for complaints of total body pain and was having difficulty making regular appointments due to her symptoms.  Tr. 1996.  Physical therapist Klein determined that Avery would be discharged from physical therapy for her migraines at that time.  Tr. 1996.

On September 3, 2015, Avery saw Dr. John Morren, M.D., with the Neurological Institute, Neuromuscular Center, of the Cleveland Clinic for a consultation regarding ongoing management for POTS.  Tr. 1972-1983.  Dr. Morren found that Avery's current symptoms of presyncope appeared stable/somewhat improved on her current medications of Florinef and Metoprolol and nonpharmacological measures.  Tr. 1976.  Dr. Morren noted Avery's

---

[10]  Avery no showed for or cancelled some appointments.  Tr. 1969, 1989, 1992.

nonrestorative sleep but also noted that Avery had recently been diagnosed with obstructive sleep apnea and CPAP therapy was anticipated to provide significant benefits.  Tr. 1976.  Dr. Morren recommended that Avery continue with most of her current POTS treatment plan.  Tr. 1976.  He recommended that Avery follow up with sleep medicine as soon as possible and to start a trial of Melatonin to try to improve her restorative sleep.  Tr. 1976.

Avery saw Dr. Jaeger on February 8, 2016.  Tr. 2012-2022.  Avery last saw Dr. Jaeger on April 20, 2015.  Tr. 2012.  Avery stated she had lightheadedness/dizziness almost daily; she had near syncope a couple of times per week; her palpitations had improved with beta blockers; she had chest pain a couple of times per month; she had shortness of breath with climbing stairs or walking long distances; she had recently been diagnosed with obstructive sleep apnea and was wearing a CPAP nightly; she had edema in her hands, feet, and joints with bruising on her hands; she had been diagnosed with discoid lupus, restless leg syndrome, and TMJ since her last visit; she "had no syncope, orthopnea, PND."  Tr. 2012-2013.  Dr. Jaeger reviewed Avery's ongoing treatment plan; no additional treatment recommendation were made at the visit.  Tr. 2015-2016.

### 2.  Opinion evidence

*Treating source*

*Dr. Jaeger*

On February 12, 2013, Dr. Jaeger completed a Certification of Health Care Provider for Employee's Serious Health Condition FMLA form.  Tr. 665-668.   In that form, Dr. Jaeger certified that Avery had a medical condition that caused recurrent near syncope and syncope.  Tr. 666.  Dr. Jaeger indicated that Avery was unable to perform job functions due to her condition; she would be incapacitated for a single continuous period of time due to her medical condition, with the duration of the period of incapacity being noted as "unknown;" she would need to attend

follow-up treatment appointments or work part-time on a reduced schedule because of her condition; her condition would cause episodic flare-ups periodically which would prevent her from performing her job functions and it would be medically necessary for Avery to be absent from work during the flare-ups, with the frequency of flare-ups and related period of incapacity being noted as "unknown."  Tr.  666-667.

In a treatment record from a March 31, 2014, office visit, Dr. Jaeger noted that the visit was primarily motived because Avery wanted "to discuss further her inability to work full-time due to weakness, fatigue, palpitations, lightheadedness, etc.[,]" Dr. Jaeger indicated "It seems reasonable if her full-time schedule exacerbates her symptoms that she tries to cut back if her employer will allow."  Tr. 264.  On April 1, 2014, Dr. Jaeger sent a letter to Avery's employer indicating that he agreed with Avery's request that she be permitted to work part-time (20 hours per week) until May 30, 2014.  Tr. 671.  Dr. Jaeger explained that "Mrs. Avery's symptoms are exacerbated by working full time and feels it would be beneficial to her well being to reduce her weekly working hours.  I agree with Mrs. Avery's decision and hope that you can accommodate her change in schedule."  Tr. 671.

### Dr. Browning

On August 27, 2014, Dr. Browning provided a medical excuse, indicating that Avery should be placed on limited duty at work, i.e., 20 hours per week, with the restriction applying from August 26, 2014, through October 31, 2014.  Tr. 673.   On November 1, 2014, Dr. Browning provided a similar medical excuse, indicating that Avery should be placed on limited duty at work, i.e., 20 hours per week, with the restriction applying from November 1, 2014, through December 31, 2014.  Tr. 672.

### Dr. Calles

20

On March 12, 2016, Dr. Calles completed a Physical Medical Source Statement.  Tr. 1964-1967.  Dr. Calles reported that he had been treating Avery for two and one-half years for POTS.  Tr. 1964.  Dr. Calles indicated that Avery's condition was incurable at the stage it was at and treatments were modestly effective.  Tr. 1964.  Dr. Calles noted that symptoms included syncopal episodes (passing out) due to drop in blood pressure; dizziness; fatigue; instability when walking due to drop in blood pressure.  Tr. 1964.  Dr. Calles also noted the following clinical findings and objective signs: drop in blood pressure when going from lying or sitting to a standing position, especially after being in bed overnight, or when changing positions or when standing for too long.  Tr. 1964.

Dr. Calles rated Avery's functional abilities, opining that Avery could sit for more than an hour at one time; stand for just a few minutes at times and up to 30-60 minutes at other times; and stand/walk for a total of less than 2 hours in an 8-hour workday.  Tr. 1965.  Dr. Calles opined that Avery would require a job that allowed shifting positions at will from sitting, standing or walking; could never lift or carry 10 pounds; could never stoop; could rarely crouch/squat, climb stairs, or climb ladders; and could occasionally twist; had no significant limitations with reaching, handling or fingering;[11] would likely be off task 25% or more of the time; would be incapable of even "low stress" work; and would likely miss more than four days of work per month.  Tr. 1965-1967.

When asked whether Avery would need to take unscheduled breaks in addition to normal breaks, Dr. Calles opined "I do no[t] think she can maintain a normal shift."  Tr. 1965.  Dr.

---

[11] In her brief, Avery indicates that Dr. Calles opined that she would have significant limitations with reaching, handling or fingering.  Doc. 14, p. 13.  However, in response to the question whether the patient has significant limitations in reaching, handling or fingering, the "no" box was clearly checked and, while there is a mark in the "yes" box, the mark appears to be a cross-out of a checkmark.  Tr. 1966.  That the intended answer was "no" is supported by the fact that Dr. Calles did not provide percentages of time that reaching, handling or fingering could be performed.  Tr. 1966.

Calles indicated that sometimes Avery had to use a cane or hand-held assistive device while engaging in occasional standing/walking because of imbalance, insecurity, weakness and drop in her blood pressure.  Tr. 1966.

*Consultative examiner*

*Dr. Painter*

On March 24, 2016, Dr. Daniel Painter, M.D., of MetroHealth, completed a Physical Medical Source Statement based on a disability evaluation performed on March 23, 2016.  Tr. 2026-2030.  Dr. Painter indicated that Avery's diagnoses included POTS, fibromyalgia, myofascial pain, lower back pain, and obstructive sleep apnea.  Tr. 2026.  Avery's symptoms included diffuse myofascial pain, dizziness with exertion, fatigue, nonrestorative sleep, and anxiety.  Tr. 2026.  Dr. Painter described Avery's pain as diffuse myofascial muscular aches and tightness, predominantly in the low back.  Tr. 2026.  Dr. Painter indicated that clinical findings and objective signs were diffuse lumbosacral tenderness to palpation; decreased lumbar range of motion with flexion/extension/side bending; weakness in the deltoids; right hip flexion decreased; right grip strength decreased; and exertional fatigue.  Tr. 2026.  Dr. Painter indicated that treatment included Gabapentin for Avery's lumbar radicular pain, which was improving her symptoms but could cause lethargy/sedation.  Tr. 2026.  Also, Avery was taking Cymbalta for anxiety/depression, which could cause drowsiness.  Tr. 2026.

Dr. Painter estimated that Avery could walk one city block without rest or severe pain, noting shortness of breath, palpitations, and fatigue.  Tr. 2028.  Dr. Painter opined that Avery could sit at one time for more than 2 hours; she should stand at one time for 10-15 minutes; she could sit at least 6 hours total in an 8-hour workday; and she could stand/walk for less than 2 hours total in an 8-hour workday.  Tr. 2028.  Dr. Painter opined that Avery would need a job that

22

allowed for shifting positions at will from sitting, standing or walking. Tr. 2028. Dr. Painter indicated that Avery would need to have periods of walking around every 60 minutes for 5 minutes at a time during an 8-hour workday. Tr. 2028. Dr. Painter opined that Avery would need to take unscheduled breaks every hour for about 15 minutes at a time during a workday due to muscle weakness, chronic fatigue, pain/paresthesias, numbness. Tr. 2028. Dr. Painter indicated that Avery would not need to use a cane or other hand-held device when standing/walking occasionally. Tr. 2029.

Dr. Painter opined that Avery could never lift or carry more than 10 pounds; could rarely lift or carry 10 pounds; could never climb ladders; could rarely stoop, crouch/squat, or climb stairs; and could occasionally twist. Tr. 2029. Dr. Painter opined that Avery had significant limitations with reaching, handling and fingering. Tr. 2029. Dr. Painter opined that Avery would be off task 20% of the time and would miss about three days of work per month. Tr. 2030. Avery would be incapable of even "low stress" work due to high anxiety and chronic nature of her symptoms. Tr. 2030.

In summary, Dr. Painter indicated that Avery's work limitations were largely due to her orthostatic hypotension which leads to tachycardia, dizziness and fatigue after minimal exertion whereas her weakness and pain were not as limiting. Tr. 2030.

## C.    Hearing testimony

### 1.    Plaintiff's testimony

Avery was represented and testified at the hearing. Tr. 45-78, 79-81, 82-83. On the day of the hearing, Avery explained that she was having an okay day. Tr. 77. She explained, however, that she was feeling anxiety, she was having pain in her joints and back, and she had a headache. Tr. 77-78. The ALJ asked Avery what would be difficult for her if she had to

perform a sedentary job, meaning she would sit for 6 out of 8 hours in a workday.  Tr. 78.  Avery indicated a lot of things would be hard for her, including traveling and getting to work on time; not calling off from work; needing to have breaks; needing to be able to get up and move around to stretch and possibly lie down; and inability to do repetitive things.  Tr. 78.

Avery has a driver's license and drove two or three days each week but usually does not drive for more than 15 minutes.  Tr. 46, 47.  It is sometimes difficult for her to drive due to pain in her leg and/or dizziness caused by too much sun/heat.  Tr. 46-47.

Avery relayed that she has always had asthma and migraines.  Tr. 47.  When she was 15 years old, she passed out while at a dance.  Tr. 47-48.  After that occurred, she started having problems walking – she could not walk more than a few feet without falling down.  Tr. 48.  She would get dizzy, her heart would race, and she would have palpitations.  Tr. 48.  Her body felt numb and as if gravity was pulling her down.  Tr. 48.  Her migraines worsened and she had problems focusing and concentrating.  Tr. 48.   Avery started to gain her strength back and was able to start working with her mother in her mother's in-home daycare.  Tr. 48-50.  She then started working at a daycare center as a childcare provider and then as a site supervisor.  Tr. 50.  She worked at that job for about two years and then left that job after she started falling down more at work, which she indicated was likely due to increased stress.  Tr. 50.   Avery continues to fall frequently due to her various conditions and symptoms, including joint pain, overall weakness, and presyncopal episodes.  Tr. 75.

Avery explained that POTS is a constant challenge for her.  Tr. 56-57.  There are various triggers, including postural issues, emotions, stress, and environmental factors.  Tr. 47.  The triggers can cause her to have palpitations, dizziness, migraines, and a drop in her blood pressure.  Tr. 57.  Avery indicated that she had presyncopal (ready to faint) episodes three to five

times per week with a duration of four to five minutes.  Tr. 57.  Avery's tachycardia palpitations remained reduced on beta blocker therapy.  Tr. 57.  Prior to being on beta blocker therapy, Avery explained that she constantly felt that she was running a marathon.  Tr. 57.  After starting the therapy, the constant marathon running feeling decreased enough that she did not feel short of breath all the time or fatigued all the time.  Tr. 58.  Also, with the beta blocker therapy, she was no longer suddenly collapsing or blacking out.  Tr. 59.  She explained that she still had days when her palpitations are at a high number but it was no longer 24/7.  Tr. 58-59.  Avery's doctors felt that her dosage of the beta blockers was at the right level because her energy level was low and, if they were to increase her dosage any higher, she would be less able to move and less energetic.  Tr. 59.  When Avery has palpitations and tachycardia, there are times that she has to stop doing what she is doing because, if she tries to do something later, her blood pressure drops too much and she gets really weak.  Tr. 60.  Avery notices that she has more episodes of her heart racing and palpitations if she is moving around during the day rather than sitting.  Tr. 60-61.  Before being on beta blockers, Avery estimated visiting the emergency room three times per week by ambulance.  Tr. 69-70.  Her visits were usually the result of her POTS and passing out with tachycardia.  Tr. 70.  She also visited the emergency room because of severe migraines.  Tr. 70.

Avery experiences full syncopal episodes, i.e., passing out altogether, a few times each month.  Tr. 70.  The episodes usually come on without warning.  Tr. 70-71.  During an episode, Avery is out for a few minutes.  Tr. 71.  She is usually with a family member and they respond by giving her water and salt, elevating her legs, and applying ice to her head to cool her down.  Tr. 71.  Following an episode, Avery might not be able to get up again and move around until the next day because she is very weak with no energy.  Tr. 71.  Avery's energy is generally low.  Tr.

25

71. She has asked her doctors for natural remedies to help with her energy but there is caffeine in almost everything and she cannot have caffeine.  Tr. 72.  On and off throughout the day, Avery is dizzy and lightheaded.  Tr. 72.  The extent of her dizziness and lightheadedness varies. Tr. 72.  Avery's doctors have recommended that she increase her salt and fluids.  Tr. 74.  She drinks at least 3 liters of Gatorade, Powerade or Pedialyte for the electrolytes along with her regular intake of fluids, e.g., water, juice, milk, etc.  Tr. 74.  Due to the large amount of fluids she drinks, Avery estimated having to use the restroom once or twice every hour.  Tr. 74-75.

Avery discussed the pain in her back, explaining that the pain was sharp and, on an average day, was about a six on a scale of one to ten, with ten being the most severe.  Tr. 61. Avery takes pain medication but she does not feel that the dosage is adequate.  Tr. 61.  She has discussed this with her doctor but her doctor does not want her to be on narcotic pain medication and, with all the other medication she is on, Avery also does not want to take narcotic pain medication.  Tr. 61-62.  She takes 800 mg of Motrin to help with the pain and inflammation of her joints but does not feel that it makes much of a difference.  Tr. 62.  She has had problems with inflammation in her knees, ankles and wrists.  Tr. 72.  It causes a lot of pain even with taking Motrin.  Tr. 73.  Avery feels that the pain has gotten worse since she was diagnosed with lupus.  Tr. 73.  She has had to get shots to help with her joint problems.  Tr. 73.

Avery has problems sleeping.  Tr. 62.  She has sleep apnea and uses a CPAP machine. Tr. 62.  She also takes melatonin and gabapentin to help her with her restless leg syndrome.  Tr. 63.  If Avery gets a good night sleep, she does not necessarily have more energy the following day but it helps reduce the occurrence of migraines.  Tr. 63.  Avery estimated having five migraines headaches per week as well as other headaches during the week.  Tr. 63-64.  Avery explained that she gets constant headaches and pain but, when she has a migraine, her vision is

26

poor with black spots; it is hard for her to focus and keep her eyes open; and she has sensitivity to the light.  Tr. 64.  During a good week, Avery estimated that her migraines last a few hours.  Tr. 64.  During a bad week, Avery explained that she felt like her migraines lasted for two days in a row.  Tr. 64.

Avery uses an inhaler as needed for her asthma.  Tr. 65.  She has been able to cut down on use of her inhaler.  Tr. 65.  She has a nebulizer machine at home but she only uses it when her condition is extreme.  Tr. 65.

Avery indicated that all of her physical conditions have impacted her psychologically.  Tr. 65.  She takes Cymbalta but does not think that it is adequately controlling her anxiety and depression. Tr. 65-66.  She has problems concentrating.  Tr. 73-74.  Avery indicated her ability to interact with strangers in public was poor.  Tr. 76.  She considers herself a people person but her stress level is different now than it was in the past.  Tr. 76.  She is less able to tolerate stress and less able to hold in her emotions.  Tr. 76.  Even a minor conflict with a family member can set her back.  Tr. 76.

Avery can do dishes if she is in a chair.  Tr. 66.  She tries to prepare meals about three or four times each week.  Tr. 66.  Her husband takes care of the rest of the household chores with the help of their eight-year-old son.  Tr. 66.  Avery's husband goes to the grocery store.  Tr. 67.  If Avery accompanies him, she rides in an electrical chair.  Tr. 67.  Avery estimated being able to lift about 10 pounds.  Tr. 67.  She can walk less than a block, which she estimated was about seven houses down from her house.  Tr. 67.  Avery uses a cane at times.  Tr. 67-68.  She indicated that a doctor did not prescribe it for her but it was recommended years prior when her POTS started.  Tr. 68.

27

Towards the end of Avery's employment, her employer was accommodating her.  Tr. 68.
For example, they allowed her to take breaks as long as she needed; call off work without being
written up; and manage her diet to help control her blood pressure.  Tr. 68.  Eventually, her
employer had enough and let her go.  Tr. 68-69.  When her employer let her go they suggested
that she apply for unemployment.  Tr. 69.  Avery did not apply for unemployment.  Tr. 69.  She
explained that she did not do so because she was required to accept a full-time job if it was
offered to her and none of her doctors would sign a physical indicating that she could work full-
time and Avery did not believe that she could work full-time.  Tr. 69.  Avery's doctors have
provided her with a disability placard.  Tr. 69.

### 2.  Vocational expert's testimony

Vocational expert ("VE") Paula Zinsmeister testified at the hearing.  Tr. 79-87.   The VE
described Avery's past work to include (1) tax preparer, a sedentary, SVP 4 job; (2) teacher aide
II, a light, SVP 3 job; and (3) child daycare center worker, a light, SVP 4 job.[12]  Tr. 81-82.

For his first hypothetical, the ALJ asked the VE to consider a hypothetical individual
with Avery's vocational profile who was limited to light work except she should never climb
ladders, ropes or scaffolds; she could occasionally climb ramps or stairs, balance, stoop, kneel,
crouch and crawl; she should avoid concentrated exposure to temperature extremes and
humidity; she should avoid concentrated exposure to fumes, odors, dusts, gases, and poorly
ventilated areas; she should avoid all exposure to hazards such as dangerous machinery and

---

[12] SVP refers to the DOT's listing of a specific vocational preparation (SVP) time for each described occupation.
Social Security Ruling No. 00-4p, 2000 WL 1898704, *3 (Dec. 4, 2000).   "Using the skill level definitions in 20
CFR 404.1568 and 416.968, unskilled work corresponds to an SVP of 1-2; semi-skilled work corresponds to an SVP
of 3-4; and skilled work corresponds to an SVP of 5-9 in the DOT."  *Id.*

28

unprotected heights; she would be limited to tasks with no strict time demands, no strict

production quotas, and no more than minimal or infrequent changes in the work setting; and she

would be limited to occasional interaction with the public.  Tr. 83-84.  The VE indicated that the

described individual would be unable to perform Avery's past relevant work but there would be

light jobs available, including (1) routing clerk; (2) merchandise marker; and (3) small products

assembler.  Tr. 84.  The VE provided national job incidence data for each of the identified jobs.

Tr. 84.

For his second hypothetical, the ALJ asked the VE to consider the first hypothetical but at

a sedentary level.  Tr. 84.  The VE indicated that Avery's past relevant work would not be

available but there would be jobs available at the sedentary level, including (1) document

preparer; (2) final assembler; and (3) circuit board inspector/cleaner.  Tr. 84-85.  The VE

provided national job incidence data for each of the identified jobs.  Tr. 85.

In response to questions from Avery's counsel, the VE indicated that the jobs identified

in response to the sedentary hypothetical would remain available even if the individual's ability

to stand/walk was less than two hours.  Tr. 85-86.  The VE stated that, if an individual could not

handle work stress such that they would be unable to meet the demands of the job, the individual

would not be employable.  Tr. 86.  If an individual needed the ability to change positions at will

and walk around for five or six minutes every time they got up, the VE indicated there would be

no work for that individual if it resulted in the individual being off task for more than 15% of the

workday.  Tr. 86.  If an individual were to miss work three or four days each month, the VE

indicated that such a limitation would preclude employment.  Tr. 86.  If the individual described

in the sedentary hypothetical required use of a cane while standing, the VE indicated that there

would be no work available because the individual would need their hands to work.  Tr. 86-87.

### III. Standard for Disability

Under the Act, 42 U.S.C § 423(a), eligibility for benefit payments depends on the existence of a disability.  "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  Furthermore:

> [A]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy[13] . . . .

42 U.S.C. § 423(d)(2).

In making a determination as to disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations.  The five steps can be summarized as follows:

1. If the claimant is doing substantial gainful activity, he is not disabled.

2. If the claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3. If the claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, the claimant is presumed disabled without further inquiry.

4. If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if the claimant's impairment prevents him from doing past relevant work.  If the claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

---

[13] "'[W]ork which exists in the national economy' means work which exists in significant numbers either in the region where such individual lives or in several regions of the country."  42 U.S.C. § 423(d)(2)(A).

5.    If the claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. § 404.1520; *see also Bowen v. Yuckert*, 482 U.S. 137, 140-42, 96 L. Ed. 2d 119, 107 S. Ct. 2287 (1987).  Under this sequential analysis, the claimant has the burden of proof at Steps One through Four.  *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997).  The burden shifts to the Commissioner at Step Five to establish whether the claimant has the RFC and vocational factors to perform work available in the national economy.  *Id.*

### IV. The ALJ's Decision

In his March 1, 2017, decision, the ALJ made the following findings:[14]

1.    Avery met the insured status requirements of the Social Security Act through December 31, 2019.  Tr. 12.

2.    Avery did not engage in substantial gainful activity since April 7, 2014, the alleged onset date.[15]  Tr. 12.

3.    Avery had the following severe impairments: asthma, postural orthostatic tachycardia syndrome with occasional syncope and frequent near syncope episodes, lumbar degenerative disc disease, vestibular migraine headaches, depressive disorder and anxiety-related disorder.  Tr. 12.  Avery also had non-severe impairments of fibromyalgia,[16] discoid lupus erythematosus, temporomandibular joint (TMJ) dysfunction, hypothyroidism, and obstructive sleep apnea.  Tr. 13.

4.    Avery did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments.  Tr. 13-16.

---

[14] The ALJ's findings are summarized.

[15] The ALJ noted that Avery had earnings in the third quarter of 2014 that were above the level of substantial gainful activity and that Avery had earnings in the fourth quarter of 2014 and first quarter of 2015 but concluded that it was not necessary to determine whether Avery's work activity constituted disqualifying substantial gainful activity because there existed a valid basis for denying her application, as explained further in his decision.  Tr. 12.

[16] The ALJ explained further that fibromyalgia was not a medically determinable impairment.  Tr. 13.

5.     Avery had the RFC to perform sedentary work as defined in 20 C.F.R. 404.1567(a), except she should never climb ladders, ropes or scaffolds; she could occasionally climb ramps or stairs, balance, stoop, kneel, crouch and crawl; she should avoid concentrated exposure to temperature extremes and humidity; she should avoid concentrated exposure to fumes, odors, dusts, gases, and poorly ventilated areas; she should avoid all exposure to hazards, such as dangerous machinery and unprotected heights; she would be limited to tasks with no strict time demands, no strict production quotas, and no more than minimal or infrequent changes in the work setting; and she would be limited to occasional interaction with the public.  Tr. 16-22.

6.     Avery was unable to perform her past relevant work as a tax preparer, teacher aide II, or child daycare center worker.  Tr. 23.

7.     Avery was born in 1988 and was 25 years old, defined as a younger individual age 18-44, on the alleged disability onset date.  Tr. 23.

8.     Avery had at least a high school education and could communicate in English.  Tr. 23.

9.     Transferability of job skills was not material to the determination of disability.  Tr. 23.

10.    Considering Avery's age, education, work experience and RFC, there were jobs that existed in the national economy that Avery could perform, including document preparer, final assembler, and circuit board inspector/cleaner.  Tr. 23-24.

Based on the foregoing, the ALJ determined that Avery had not been under a disability, as defined in the Social Security Act, from April 7, 2014, through the date of the decision.  Tr. 24.

## V. Plaintiff's Arguments

Avery contends that the ALJ's RFC is not supported by substantial evidence.  Doc. 14, pp. 3, 14-25.  She argues that the ALJ improperly weighed opinion evidence and ignored or mischaracterized evidence regarding symptoms related to POTS, including syncope, palpitations, tachycardia, fatigue, migraines, dizziness and lightheadedness, frequent bathroom breaks, and weakness.  Doc. 14, pp. 3, 14-25.

32

## VI.  Law & Analysis

### A.  Standard of review

A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record.  42 U.S.C. § 405(g); *Wright v. Massanari*, 321 F.3d 611, 614 (6th Cir. 2003).  "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992) (quoting *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).   The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive."  *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)).

A court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility."  *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).  Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, a reviewing court cannot overturn the Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ."  *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).  When assessing whether there is substantial evidence to support the ALJ's decision, the Court may consider evidence not referenced by the ALJ.  *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001).

### B.  The undersigned recommends that the Court affirm the Commissioner's decision

Avery contends that the ALJ's RFC is not supported by substantial evidence.  Doc. 14, pp. 3, 14-25.  She argues that the ALJ improperly weighed opinion evidence and ignored or

33

mischaracterized evidence regarding symptoms related to POTS, including syncope, palpitations, tachycardia, fatigue, migraines, dizziness and lightheadedness, frequent bathroom breaks, and weakness.  Doc. 14, pp. 3, 14-25.

The Regulations make clear that a claimant's RFC is an issue reserved to the Commissioner and the ALJ assesses a claimant's RFC "based on all of the relevant evidence" of record.  20 C.F.R. §§ 404.1545(a)(3), 404.1546(c).

Contrary to Avery's position, the ALJ did not mischaracterize or ignore evidence relating to her POTS diagnosis.  The ALJ provided a detailed discussion of the evidence, including Avery's medical treatment history, her subjective allegations, and her activities of daily living. For example, the ALJ discussed Avery's subjective statements regarding symptoms caused by her medical impairments, including POTS, stating:

> [Avery] stated that she wakes up weak and she falls asleep fatigued (Exhibit 5E).
> She reported that her strong palpitations cause shortness of breath, chest tightening
> and at times triggers an asthma flare-up (Exhibit 7E).  She reported black spots with
> her vision.  She has hot flashes with dizzy spells causing weakness.  She avoids
> reaching, bending or lifting because of her POTS.

Tr. 16-17.

The ALJ also discussed that Avery testified to being diagnosed with POTS at age 15 and that she was taking beta blockers for her tachycardia and that the dosage was good.  Tr. 17.  In addition to discussing Avery's subjective statements regarding POTS and the extent of her symptoms relating thereto, the ALJ considered medical evidence regarding Avery's POTS diagnosis.  For example, the ALJ discussed Dr. Li's 2013 treatment records which reflected that Avery's chief complaint was dizziness and Dr. Li's notes regarding Avery's longstanding POTS history that had started years prior.  Tr. 17, 289.  The ALJ further discussed that Dr. Li noted that Avery had made a lot of behavioral modifications for POTS and that Dr. Li noted that Avery's

34

dizziness might not be fully explained by her POTS because a large portion of her dizziness was not postural or did not appear to reflect orthostatic intolerance.  Tr. 18, 291.  Also, Dr. Li observed that Avery suffered from headaches and dizziness/vertigo that is a common symptom in patient's suffering from frequent headaches.  Tr. 18, 291.

The ALJ also discussed later treatment records from Dr. Li regarding Avery's diagnosis of POTS as well as treatment records from other treatment providers, including Dr. Jaeger, Dr. Browning, and Dr. Morren, all of whom treated Avery for POTS and/or syncope.  Tr. 18-20.  In discussing those treatment records, the ALJ noted that Dr. Browning's treatment records from the fall of 2014 reflected that going back to work full time had resulted in a worsening of Avery's symptoms and Avery had to take several sick days due to symptoms even though working part time.  Tr. 19, 678, 695, 696.  Also, while the ALJ noted and discussed various normal physical examination findings throughout her visits to different treatment providers, the ALJ did not ignore evidence regarding other symptoms, including syncope, dizziness, fatigue and tachycardia.  Tr. 18-20.  Further, the ALJ noted the therapy sessions that Avery participated in for dizziness, vestibular migraine headaches, neck pain and POTS as well as cardiac rehabilitation sessions that Avery participated in for treatment of her POTS.  Tr. 17, 20.  The ALJ also considered evidence relating to Avery's allegations regarding the frequency of symptoms, including near syncope, dizziness and tachycardia.  For example, the ALJ discussed Dr. Morren's September 3, 2015, treatment record which discussed the frequency of quasi-syncopal episodes and presyncopal episodes as well as the effect of beta blockers on Avery's tachycardia/palpitations.  Tr. 22, 1972.  The ALJ discussed Dr. Jaeger's April 20, 2015, treatment note, which reflected that Avery reported increased and occasional tachycardia as well as a syncope episode the prior September that resulted in a visit to Metro hospital.  Tr. 19, 983.

35

The ALJ also discussed Dr. Li's November 8, 2013, treatment record which reflected that Avery's chief complaint was dizziness and included discussion of the frequency of her episodes of dizziness.  Tr. 17, 289.

Avery also takes issue with the ALJ's consideration of her reported medication/prescribed treatment side-effects, arguing that the ALJ did not properly evaluate reported drowsiness, fatigue, weakness, decreased energy and need to use the restroom frequently.  Doc. 14, p. 22.   The ALJ did not ignore Avery's reported side-effects.  *See e.g.*, Tr. 19 ("She reported some increase fatigue with increased dose of beta-blockers, but she had less tachycardia.) (citing Exhibit 10F, p. 22 (Tr. 695, November 5, 2014, treatment record); Tr. 19 (noting that Avery reported no effect on her asthma but an increase in tachycardia after her beta blocker was titrated up) (citing Exhibit 15F, p. 208 (Tr. 983, April 20, 2015, treatment record)). Additionally, an ALJ is not required to discuss every piece of evidence.  *See Thacker v. Comm'r of Soc. Sec.*, 99 Fed. Appx. 661, 665 (6th Cir. 2004); *see also Simons v. Barnhart,* 114 Fed. Appx. 727, 733 (6th Cir.2004) ("[A]n ALJ is not required to discuss all the evidence submitted, and an ALJ's failure to cite specific evidence does not indicate that it was not considered.") (internal citations omitted).  Thus, even if the ALJ did not mention all reported side effects, Avery has not shown a basis for reversal.  Avery also claims that the ALJ's statement that "There is no evidence that the claimant's use of prescribed medication is accompanied by side effects that would interfere significantly with her ability to perform work within restrictions outlined in this decision[,]" was "a blatant mischaracterization of the record."  Doc. 14, p. 22.  As indicated above, it is not for this Court to "try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility."  *Garner*, 745 F.2d at 387.  The ALJ did not conclude that Avery had no side effects from her prescribed treatment.  He considered the entirety of the record and

36

concluded that the evidence did not show side effects would <u>significantly</u> interfere with Avery's ability to perform work described in the RFC, which limited Avery to sedentary work.  Tr. 16.

A review of the decision and record in this case makes clear that the ALJ did not mischaracterize or ignore evidence pertaining to Avery's POTS or her symptoms.  Moreover, as indicated, to the extent that Avery contends that a more detailed analysis of each and every treatment record was required, an ALJ is not required to discuss every piece of evidence.  *See Thacker*, 99 Fed. Appx. at 665; *see also Simons,* 114 Fed. Appx. at 733.  Further, it is not for this Court to "try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility."  *Garner*, 745 F.2d at 387.  Thus, to the extent that Avery seeks to have this Court reweigh the evidence regarding the severity of her symptoms, the Court should decline to do so.  Moreover, the ALJ fully explained his reasons for finding Avery's subjective allegations regarding the severity, chronicity, and/or frequency of her symptoms not entirely supported by the record (Tr. 17, 22) and Avery has not shown the ALJ's reasons to be unsupported by substantial evidence.  Further, even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, this Court cannot overturn the Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ."  *Jones*, 336 F.3d at 477.

Avery also contends that the RFC is not supported by substantial evidence because the ALJ erred in weighing the medical opinions of treating physicians Dr. Jaeger, Dr. Browning and Dr. Calles and examining physician Dr. Painter.

Under the treating physician rule, "[t]reating source opinions must be given 'controlling weight' if two conditions are met: (1) the opinion 'is well-supported by medically acceptable clinical and laboratory diagnostic techniques'; and (2) the opinion 'is not inconsistent with the

other substantial evidence in [the] case record.'"  *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 376 (6th Cir. 2013) (citing 20 C.F.R. § 404.1527(c)(2)); *see also Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004).

If an ALJ decides to give a treating source's opinion less than controlling weight, he must give "good reasons" for the weight he assigns to the opinion.  *Gayheart*, 710 F.3d at 376; *Wilson*, 378 F.3d at 544; *Cole v. Comm'r of Soc. Sec.*, 661 F.3d 931, 937 (6th Cir. 2011).  In deciding the weight to be given, the ALJ must consider factors such as (1) the length of the treatment relationship and the frequency of the examination, (2) the nature and extent of the treatment relationship, (3) the supportability of the opinion, (4) the consistency of the opinion with the record as a whole, (5) the specialization of the source, and (6) any other factors that tend to support or contradict the opinion.  *Bowen v. Comm'r of Soc Sec.*, 478 F.3d 742, 747 (6th Cir. 2007); 20 C.F.R. § 404.1527(c).

An ALJ is not obliged to provide "an exhaustive factor-by-factor analysis" of the factors considered when weighing medical opinions.  *See Francis v. Comm'r of Soc. Sec*., 414 Fed. Appx. 802, 804 (6th Cir. 2011).  However, the "good reasons must be supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight."  *Cole*, 661 F.3d at 937 (quoting Soc. Sec. Rul. No. 96-2p, 1996 SSR LEXIS 9, at *12 (Soc. Sec. Admin. July 2, 1996)) (internal quotations omitted).

Where there is no ongoing treatment relationship, an opinion is not entitled to deference or controlling weight under the treating physician rule.  *See Kornecky v. Comm'r of Soc. Sec*, 167 Fed. Appx. 496, 508 (6th Cir. 2006)*; Daniels v. Comm'r of Soc. Sec.,* 152 Fed. Appx. 485, 490 (6th Cir. 2005).

_Dr. Jaeger_

Avery first takes issue with the ALJ's decision to assign "limited weight" to Dr. Jaeger's multiple opinions of record.  The opinions rendered by Dr. Jaeger consist of a February 2013 FMLA Certification form and his opinion (expressed in the 2013 FMLA Certification form and an April 2014 letter[17]) that Avery required part-time work.  Tr. 665-667, 671. The ALJ discounted the opinions contained in the 2013 FMLA Certification, in part, because the ALJ found Dr. Jaeger's statements that it was "unknown" how long the period of incapacity caused by Avery's condition would last and that the treatment scheduled, including any recovery period, was "unknown" to be vague and unhelpful.  Tr. 20, 667.  Avery claims that the ALJ's reasoning was flawed because POTS is a remitting and relapsing condition with unpredictable flares.  Even if Avery is correct, the ALJ discounted the opinions contained in Dr. Jaeger's 2013 FMLA Certification for other reasons, including that the FMLA Certification included opinions on issues reserved to the Commissioner, i.e., whether an individual is able to work or whether an individual is disabled.  While treating source opinions on issues reserved to the Commissioner may not be ignored, such opinions "are never entitled to controlling weight or special significance."  _See_ SSR 96–5p, 1996 WL 374183, * 2-3 (July 2, 1996).  Also, the ALJ discounted the opinions contained in the FMLA Certification because Dr. Jaeger had not included a function-by-function assessment of the most Avery could do despite her impairments. Tr. 20.  Avery has not shown that these reasons were invalid or unsupported by substantial evidence.

---

[17] The day before Dr. Jaeger signed the April 1, 2014, letter, Avery was in to see Dr. Jaeger for a visit at which time discussions occurred regarding Avery's ability to work full-time.  Tr. 264.

With respect to the April 1, 2014, letter, wherein Dr. Jaeger indicated that it would be beneficial that Avery reduce her working hours, the ALJ discounted this opinion, finding that the opinion was based on subjective information as opposed to objective testing.  Tr. 20.  The ALJ also noted that Avery had worked part-time with periods of full-time work, including an attempt to return to full-time work in June 2014.  Tr. 20.

Avery contends that, due to the nature of POTS, which she argues includes symptoms that are greater in proportion to any objective physical or laboratory findings, it is reasonable that Dr. Jaeger's opinion would be based on her subjective complaints as well as Dr. Jaeger's knowledge of her functioning over time.  While it is understandable that a physician will hear and report subjective statements from a patient, it is not improper for an ALJ to take into account and discount an opinion founded on a claimant's subjective statements.  *See e.g.*, *Kepke v. Comm'r of Soc. Sec.*, 636 Fed. Appx. 625, 629 (6th Cir. 2016) ("Regardless of the inherent subjectivity in the field of psychiatry, a doctor cannot simply report what his patient says and re-package it as an opinion.").

Avery also contends that that, inasmuch as she was a teacher's aide and did not work during the summer, the ALJ's statement that she attempted to return to full-time work in June 2014 was incorrect.  In support of his finding, the ALJ cited Exhibit 10F, p. 5 (Tr. 678).  That record, an office visit with Dr. Browning, is dated August 27, 2014, and reflects that Avery had returned to work full time.  Tr. 678.  Avery was evaluating her work options, noting she had been able to work part time the prior Spring but was not certain she could work full time.  Tr. 678.  Within that treatment record, it is noted that Avery's last visit occurred on June 25, 2014.  Tr. 678.  The treatment record from Avery's June 25, 2014, office visit with Dr. Browning also reflects full-time work.  Tr.  521 ( "Despite symptoms she continues to work full-time with Head

Start program.").  Thus, the record evidence supports the ALJ's finding that Avery had attempted to return to full-time work in June 2014.   Also, to the extent that the ALJ misread the date of the treatment record found at Tr. 678 (thinking it was a June rather than August 2014 record), that August 2014 record nevertheless supports the ALJ's finding that Avery had a period of full time-work.

Additionally, Dr. Jaeger's opinion that Avery could not perform full-time work falls within matters reserved to the Commissioner and therefore is not entitled to controlling weight or special significance.

Considering the foregoing, while Avery disagrees with the ALJ's findings and seeks to have this Court reweigh the opinions rendered by Dr. Jaeger, the undersigned finds that the ALJ's consideration and weighing of Dr. Jaeger's opinions satisfies the treating physician rule.

### *Dr. Browning*

Avery takes issue with the ALJ's consideration and weighing of Dr. Browning's 2014 opinions, wherein Dr. Browning indicated that Avery could return to work but in a part-time capacity through December 31, 2014.  The letters setting forth the part-time work restrictions are dated August 27, 2014 (Tr. 673) and November 1, 2014 (Tr. 672).  The ALJ explained the weight assigned to these opinions, stating:

> These opinions are given limited weight because Dr. Browning did not provide a function-by-function assessment of the most the claimant could do despite [her] impairments and the medi[c]al evidence of record demonstrates exertional, postural, environmental and non-exertional restrictions as outlined in Finding No. 5 above.

Tr. 21.

Avery does not contend that it was improper to discount the opinions on the basis that they do not contain a function-by-function assessment.  Instead, Avery argues again that the ALJ

did not fully consider all the medical records or explain how those records fail to support the ability to work only part-time.  However, as explained above, the ALJ did consider Avery's medical treatment history as well as other evidence of record, including activities of daily living, when assessing her RFC.   Additionally, Dr. Browning's opinions that Avery could not perform full-time work fall within matters reserved to the Commissioner and therefore are not entitled to controlling weight or special significance.

> ### _Dr. Calles_

Avery argues that the ALJ erred when weighing the March 12, 2016, opinion rendered by Dr. Calles, wherein he opined that Avery could not perform sedentary work or maintain a normal shift (Tr 1964-1967).  In explaining the weight assigned, the ALJ stated:

> The undersigned assigned limited weight to this opinion because the balance of the medical record supports that, although she may not be able to perform any of her past relevant work, nothing substantially prevents her from performing sedentary, unskilled work on a full-time basis.

Tr. 21.

The ALJ explained that Dr. Calles' less than sedentary functional assessment was not consistent with or supported by other evidence of record.  Such reasons are valid reasons to discount a treating physician's opinion.  While the medical evidence is not detailed directly in the portion of the decision discussing and weighing Dr. Calles' opinion, the ALJ sufficiently discussed and explained the medical records throughout his decision to allow for meaningful judicial review of the ALJ's decision.  As indicated previously, an ALJ is not required to discuss every piece of evidence.  _See Thacker v. Comm'r of Soc. Sec._, 99 Fed. Appx. at 665; _see also Simons v. Barnhart,_ 114 Fed. Appx. at 733.  Thus, even if the ALJ did not specifically discuss Dr. Calles' treatment records, Avery has not shown that a failure to do so requires reversal.  Although Avery disagrees with the ALJ's weighing of the evidence, she has not shown that the

42

ALJ's decision to assign limited weight to Dr. Calles' opinion is not supported by substantial evidence.  Even if Dr. Calles' opinion is similar to that of other physicians, the ALJ, not a physician, is responsible for assessing a claimant's RFC.  *See* 20 C.F.R. § 404.1546 (c); *Poe v. Comm'r of Soc. Sec.*, 342 Fed. Appx. 149, 157 (6th Cir. 2009).  Moreover, to the extent that Dr. Calles' opinion amounts to an opinion that Avery is unable to perform any work, that is an issue reserved to the Commissioner and not entitled to controlling weight or special significance.

### *Dr. Painter*

Avery also contends that the ALJ erred in evaluating the March 24, 2016, opinion of one-time evaluating physician Dr. Painter who opined that Avery would be limited to less than sedentary work (Tr. 2026-2030).  Her argument with respect to Dr. Painter is not fully articulated and therefore may be waived.  *See McPherson v. Kelsey*, 125 F.3d 989, 995–996 (6th Cir. 1997) ("Issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived.  It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to . . . put flesh on its bones." ) (internal citations omitted).  To the extent not waived, it appears Avery is arguing that the ALJ erred with respect to Dr. Painter's opinion because Dr. Painter's opinion was consistent with the medical records as well as other opinions, including Dr. Calles' opinion.  In weighing Dr. Painter's opinion, the ALJ explained that limited weight was assigned "because the overall medical record does not support such extreme limitations."  Tr. 21.  Dr. Painter was not a treating physician and therefore his opinion was not entitled to controlling weight.  Further, the ALJ sufficiently explained his reason for assigning limited weight and, while Avery disagrees with that assessment, she has not demonstrated that the ALJ's decision is not supported by substantial evidence.  Further, assuming arguendo that the various medical opinions contain similar, more

43

restrictive limitations than those contained in the RFC, as noted above, the ALJ, not a physician, is responsible for assessing a claimant's RFC.  *See* 20 C.F.R. § 404.1546 (c); *Poe*, 342 Fed. Appx. at 157.   Further, contrary to Avery's claim, the ALJ's decision to assign limited or no weight[18] to all the medical opinion evidence does not establish that he interpreted the medical data himself.  The ALJ did not substitute his judgment for that of medical professionals.  Rather, consistent with the regulations, the ALJ considered and weighed the opinion evidence in light of the record as a whole and formulated the RFC based on that analysis.

While Avery disagrees with the ALJ's decision and his weighing of the evidence, she has not shown a basis upon which this matter should be reversed and remanded for further consideration or evaluation of the evidence.

### VII. Conclusion and Recommendation

For the reasons discussed herein, the undersigned recommends that the Court **AFFIRM** the Commissioner's decision.

April 2, 2019

*/s/ Kathleen B. Burke*
Kathleen B. Burke
United States Magistrate Judge

### OBJECTIONS

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after the party objecting has been served with a copy of this Report and Recommendation.  Failure to file objections within the specified time may waive the right to appeal the District Court's order.  See *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).  *See also Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986).

---

[18] The ALJ assigned little or no weight to the opinions of the state agency reviewers, finding that the medical evidence of record supported greater limitations than found by the state agency reviewers.  Tr. 22.